## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

In re:                                               :        Chapter 11

                                                  :

LENSAR, INC.,                                        :        Case No. 16-_____

                                                  :

                Debtor.[1]                              :

                                                  :

-------------------------------------------------------------x

## DECLARATION OF NICHOLAS T. CURTIS IN SUPPORT
## OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

Under 28 U.S.C. § 1764, Nicholas T. Curtis declares as follows under the penalty of perjury:

1.      I am the Chief Executive Officer of Lensar, Inc. the "**Debtor**" or the "**Company**"), the debtor and debtor in possession in the above-captioned bankruptcy case.  The Company is a corporation organized under the laws of the State of Delaware (in the above captioned chapter 11 case (the "**Chapter 11 Case**").  I have served as Chief Executive Officer since the first quarter of 2012.  I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtor.

2.      As Chief Executive Officer, I am responsible for overseeing the day-to-day operations and financial activities of the Company, including but not limited to, monitoring cash flow, business relationships, workforce issues, and tax and financial planning.  As a result of my tenure with the Debtor, my review of certain documents, and my discussions with other members of the Debtor's management team, I am generally familiar with the Company's business, financial condition, policies and procedures, day-to-day operations, and books and

---

[1]  The Debtor in this case and the last four digits of the Debtor's federal tax identification number are: Lensar, Inc. (5724).  The Debtor's corporate headquarters are located at 2800 Discovery Drive, Orlando, Florida 32826.

records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtor's employees or retained advisers that report to me in the ordinary course of my responsibilities.  I am authorized by the Debtor to submit this First Day Declaration.  References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.      On December 16, 2016 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  The Debtor will continue to operate its business as a debtor in possession.

4.      I submit this First Day Declaration on behalf of the Debtor in support of the Debtor's (a) voluntary petition for relief that was filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. § § 101-1330, as amended (the "**Bankruptcy Code**") and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[2]  The Debtor seeks the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Case on its business.  I have reviewed the Debtor's petition and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtor's business and to successfully maximize the value of the Debtor's estate.

---

[2]  Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

## PART I

I.   **COMPANY AND BUSINESS OVERVIEW**

5.     The Debtor was formed in 2004 under the laws of the State of Delaware and remains incorporated in Delaware.  The Debtor's headquarters are located in Orlando, Florida.  The Debtor is a high technology medical devices company that develops and markets lasers primarily for use in refractive cataract surgery.  The Debtor's technology uses a unique imaging process which converts multiple two dimensional scans into a 3-D model based on each patient's biometric measurements.

6.     The Debtor has approximately 54 full-time employees, engaged in all aspects of developing the Debtor's laser technology, testing its clinical applications, interfacing with the Federal Drug Administration and other regulators, sales and marketing, and providing technical support to end-users.  None of the Debtor's employees are party to any collective bargaining agreement.

7.     The Debtor has 17 classes of stock consisting of (i) common stock ("**Common Stock**"), (ii) Series A-1 through Series A-6 preferred stock (collectively, the "**Series A Equity Interests**"), (iii) Series B, Series C, Series D, Series E, Series E-1, Series E-2, Series E-3 and/or Series E-4 preferred stock (collectively the "**Senior Preferred Equity Interests**") and (iv) Series E-5 preferred stock (the "**E-5 Equity Interests**").  Because the calculation of 5% holders and a controlling holder both depend, in part, on the relative value of each series of preferred stock and the common stock, the exact amount of any given type of stock that would cause a shareholder to be a 5% holder can vary and it is not possible to definitively state in advance and in the abstract the number of shares that would constitute 5% or 50%.  Moreover, multiple parties own shares in more than one series of preferred stock and common stock.  The Debtor has not, therefore, attempted to define who is a 5% holder.

8.      I have been advised that the Bankruptcy Code contains provisions that apply only to "health care businesses" (as that term is defined under the Bankruptcy Code). Based on my knowledge of the Debtor's business, I do not believe that the Debtor is a health care business.  The Debtor markets and sells medical devices to surgeons and hospitals and is not engaged in the business of providing health care services directly to any patients.

## PART II

9.      In furtherance of the objective of the reorganization of the Debtor on a stand-alone basis, the Debtor has sought approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and respectfully requests that the Court consider entering the Proposed Orders granting such First Day Pleadings.  For the avoidance of doubt, the Debtor seeks authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Pleadings.

10.     I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtor to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to its business or loss of productivity or value and (b) constitutes a critical element in the Debtor's being able to successfully maximize value for the benefit of the estate.

I.      **BUSINESS OPERATION MOTIONS**

A.      **Cash Management Motion**

11.     In the Cash Management Motion,[3] the Debtor seeks entry of interim and final orders, pursuant to sections 105(a), 345 and 363 of the Bankruptcy Code, (i) authorizing, but not directing, the Debtor to continue to maintain and use its existing cash management system, including maintenance of existing bank accounts, checks, and business forms; (ii) granting the Debtor a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with the Debtor's practices under its existing cash management system or other actions described herein; and (iii) authorizing, but not directing, the Debtor to continue to maintain and use its existing deposit practices notwithstanding the provisions of section 345(b) of the Bankruptcy Code.  The Debtor also requests that the Court authorize and direct the Bank with which the Debtor maintains accounts to continue to maintain, service, and administer such accounts and authorize third-party payroll and benefits administrators and providers to prepare and issue checks on behalf of the Debtor.  As of the Petition Date, the Debtor estimates that it has approximately $2,290,722.73 in cash on hand.

i.      The Debtor's Cash Management System and the Bank Accounts

12.     In the ordinary course of its business, the Debtor maintains a cash management system (the "**Cash Management System**") that is integral to the operation and administration of the Debtor's business.  The Cash Management System allows the Debtor to (i) monitor and control all of the Debtor's cash receipts and disbursements, (ii) identify the cash

_____

[3] The "Cash Management Motion" refers to that certain motion filed concurrently herewith seeking relief related to the Debtor's Cash Management System and items related thereto.

requirements of the Debtor and (iii) transfer cash as needed to respond to the cash requirements of the Debtor.

13.     I believe that the Cash Management System is organized in a way that respects the cash funding and operating needs of the Debtor.  As of the Petition Date, it is my understanding that the Debtor maintains nine (9) bank accounts (collectively, the "**Debtor Bank Accounts**") at Silicon Valley Bank (referred to herein as "**SVB**" or the "**Bank**").  The Debtor Bank Accounts consist of one main deposit account (Account No. 3597)[4] (the "**Main Deposit Account**"), of which all amounts above $25,000 are swept nightly into one sweep account (Account No. 1866) ("**Main Deposit Sweep Account**"); one secondary deposit account (Account No. 7509) (the "**Secondary Deposit Account**"), of which all amounts above $25,000 are swept nightly into one sweep account (Account No. 0339) ("**Secondary Deposit Sweep Account**"); one main disbursement account (Account No. 9672) (the "**Main Disbursement Account**"); one secondary disbursement account (Account No. 7490) (the "**Secondary Disbursement Account**"); one investment account (Account No. 2762) (the "**Investment Account**"), of which all amounts above $25,000 are swept nightly into one sweep account (Account No. 7000) ("**Investment Sweep Account**"); and, a collateral money market account (Account No. 7183) (the "**CMM Account**").  The schedule of the Debtor Bank Accounts is annexed to the Cash Management Motion as Attachment 1.

14.     I believe that the Debtor employs a safe and cost-effective Cash Management System that takes into account the funding and operating needs of the Debtor.  I am informed and believe that the general cash collection and distribution process of the Debtor is as follows:  All customer payments are deposited into the Main Deposit Account.  The balance

---

[4]   For the sake of simplicity, this First Day Declaration uses only the last four digits of each account number to identify each account.

above $25,000 of the amount held in the Main Deposit Account is swept nightly into the Main

Deposit Sweep Account.  Funds, as needed, are routinely transferred from the Main Deposit

Account to the Main Disbursement Account to fund payments.  All payments are made from the

Main Disbursement Account.  The Secondary Deposit Account holds funds until needed for

operations.  Funds, as needed, are transferred from the Secondary Deposit Account into the Main

Disbursement Account when the operational cash flow within the Main Disbursement Account is

less than the amount to be disbursed.  The balance above $25,000 of the amount held in the

Secondary Deposit Account is swept nightly into the Secondary Deposit Sweep Account.  The

CMM Account holds $100,000 of restricted cash, which is a guarantee for a SVB corporate

MasterCard.  The MasterCard has a $100,000 credit limit and is used for corporate and employee

cards; the MasterCard is paid in full monthly with a current outstanding balance of $54,500.

      ii.      Continued Use of the Debtor's Cash Management System and the Debtor Bank Accounts

      15.      I believe that the Cash Management System is an ordinary course,

customary and essential business practice, the continued use of which is essential to the Debtor's

business operations during the Chapter 11 Case and its goal of maximizing value for the benefit

of all parties in interest.  I believe that to require the Debtor to adopt a new cash management

system at this early and critical stage would be expensive, impose needless administrative

burdens, and cause undue disruption.  I believe that any disruption in the collection of funds as

contemplated and as currently implemented would adversely (and perhaps irreparably) affect the

Debtor's ability to maximize estate value.  Moreover, such a disruption would be wholly

unnecessary because the Cash Management System provides a valuable and efficient means for

the Debtor to address its cash management requirements and, to the best of my knowledge, the

Debtor Bank Accounts are held at a financially stable institution insured by the Federal Deposit

Insurance Corporation ("**FDIC**").  I believe that maintaining the existing Cash Management

System without disruption is in the best interests of the Debtor, the estate, and all interested

parties.

16.     If the relief requested in the Cash Management Motion is granted, I am

informed that the Debtor will implement appropriate mechanisms to ensure that no payments

will be made on any debts incurred by the Debtor prior to the Petition Date, other than those

authorized by this Court.  I am informed that to prevent the possible inadvertent payment of

prepetition claims against the Debtor, except those otherwise authorized by the Court, the Debtor

will work closely with SVB to ensure appropriate procedures are in place to prevent checks

issued by the Debtor prepetition from being honored absent this Court's approval and to ensure

that no third-party with automatic debit capabilities is able to debit amounts attributable to the

Debtor's prepetition obligations.  However, the Debtor requests in the Cash Management Motion

that where the Bank implements such handling procedures and then honors a prepetition check or

other item drawn on any account that is the subject of this Motion (a) at the direction of the

Debtor to honor such prepetition check or item, (b) in a good faith belief that the Court has

authorized such prepetition check or item to be honored, or (c) as a result of a good faith error

made despite implementation of reasonable item handling procedures, it not be deemed to be

liable to the Debtor or to the estate on account of such prepetition check or other item being

honored postpetition.  I believe that such flexibility accorded to the Bank is necessary to induce

the Bank to continue providing cash management services to the Debtor.

17.     The Debtor further requests in the Cash Management Motion that the

Bank be authorized to deduct from the appropriate Debtor Bank Accounts the Bank's fees and

expenses (the "**Bank Fees and Expenses**"), and that no liens on any Debtor Bank Accounts take

priority over the Bank Fees and Expenses except as set forth in any deposit agreements between the Debtor and the Bank.

18.     Additionally, the Debtor holds the Debtor Bank Accounts at the Bank, which I am informed and believe is a party to a Uniform Depository Agreement with the U.S. Trustee.  In light of this, the Debtor will (i) contact the Bank, (ii) provide such Bank with the Debtor's employer identification numbers, and (iii) identify each of its accounts held at the Bank as held by a debtor in possession in a bankruptcy case.

19.     The Debtor further requests in the Cash Management Motion that the Debtor be authorized to implement such reasonable changes to the Cash Management System as the Debtor may deem necessary or appropriate, including, without limitation, closing any of the Debtor Bank Accounts and opening any additional bank accounts following the Petition Date (the "**New Accounts**") wherever the Debtor deems that such accounts are needed or appropriate and whether or not the banks in which the accounts are opened are designated approved depositories in the District of Delaware.  I understand that, notwithstanding the foregoing, any New Account that the Debtor opens will be (i) at the Bank or with a bank that is organized under the laws of the United States of America or any state therein and that is insured by the FDIC or the Federal Savings and Loan Insurance Corporation and (ii) designated a "Debtor in Possession" account by the relevant bank.  The Debtor requests that the relief sought by the Cash Management Motion extend to any New Accounts and that any order approving the Cash Management Motion provide that the New Accounts are deemed to be Debtor Bank Accounts that are similarly subject to the rights, obligations, and relief granted in such order.  I understand that the Debtor will provide the U.S. Trustee with prompt notice of any Debtor Bank Accounts that it closes or New Accounts that it opens.  In furtherance of the foregoing, the Debtor also

requests that the relevant banks be authorized to honor the Debtor's requests to open or close (as the case may be) such Debtor Bank Account(s) or New Account(s).

### iii. Continued Use of the Debtor's Existing Checks and Business Forms

20. To minimize expenses to the estate, the Debtor seeks authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtor's status as debtor in possession; provided, however, that in the event the Debtor generates new checks during the pendency of the Chapter 11 Case other than from its existing stock of checks, such checks will include a legend referring to the Debtor as "Debtor in Possession."  The Debtor also seeks authority to use all correspondence and other business forms (including, without limitation, letterhead, purchase orders, and invoices) without reference to the Debtor's status as debtor in possession.

21. I believe that changing the Debtor's existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtor's estate. Further, I believe that such changes would disrupt the Debtor's business operations and would not confer any benefit upon parties that deal with the Debtor.  For these reasons, the Debtor requests that it be authorized to use its existing check stock, correspondence, and other business forms without being required to place the label "Debtor in Possession" on any of the foregoing.

### iv. Waiver of Certain Requirements of the U.S. Trustee

22. The Debtor further requests in the Cash Management Motion a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with (i) the Debtor's existing practices under the Cash Management System or (ii) any action taken by the Debtor in accordance with any order granting this Motion or any other order entered in the Chapter 11 Case.  I understand that to supervise the administration of chapter 11 cases, the U.S. Trustee has established certain operating guidelines

for a debtor in possession.  I am informed and believe that such requirements (the "**<u>UST</u>**

**<u>Requirements</u>**") require chapter 11 debtors to, among other things: (i) close all existing bank

accounts and open new debtor in possession bank accounts; (ii) establish one debtor in

possession account for all estate monies required for the payment of taxes, including payroll

taxes; (iii) maintain a separate debtor in possession account for cash collateral; and (iv) obtain

checks for all debtor in possession accounts that bear (a) the designation "Debtor In Possession,"

(b) the bankruptcy case number, and (c) the type of account.  It is my understanding that the UST

Requirements are designed to demarcate clearly prepetition transactions and operations from

postpetition transactions and operations, and to prevent the inadvertent postpetition payment of

prepetition claims.

   23.  In light of the Cash Management System in place, I believe that it would

be incredibly onerous for the Debtor to meet the UST Requirements to close all existing bank

accounts and open new debtor in possession accounts.  Indeed, I believe that this requirement

would unnecessarily inconvenience the Debtor.

   24.  I further believe that it would be unnecessary and inefficient to require the

Debtor to abide by the UST Requirements to establish specific debtor in possession accounts for

tax payments (including payroll taxes) and to deposit in such accounts sufficient funds to pay

any tax liability (when incurred) associated with the Debtor's payroll and other tax obligations.  I

am informed and believe that the Debtor can pay its tax obligations most efficiently from its

existing disbursement and payroll accounts at SVB in accordance with its existing practice, and

the U.S. Trustee will have wide latitude to monitor the flow of funds into and out of such

accounts.  I believe that the creation of new debtor in possession accounts designated solely for

tax obligations would be unnecessarily burdensome.

v.      Continued Deposit Practices

25.      As part of the Cash Management System described above, I am informed that the Debtor routinely deposits funds into the Debtor Bank Accounts (the "**Deposit Practices**").  In the Cash Management Motion, the Debtor requests (i) authorization to continue to deposit funds in accordance with existing practices under the Cash Management System, subject to any reasonable changes the Debtor may implement to the Cash Management System, and (ii) a waiver of the deposit requirements of section 345(b) of the Bankruptcy Code to the extent that such requirements are inconsistent with the Deposit Practices.  For the avoidance of doubt, to the extent any of the Debtor Bank Accounts may be classified as investment accounts, or to the extent any of the Debtor's routine deposits into Debtor Bank Accounts may be regarded as investment activity, the Debtor seeks authorization in the Cash Management Motion to continue to deposit funds into such Debtor Bank Accounts in accordance with existing practices, notwithstanding the requirements of section 345(b) of the Bankruptcy Code.

26.      I believe that the continuation of the Cash Management System, including the continued use of the Debtor Bank Accounts, is essential to the efficient administration of the Chapter 11 Case and to the Debtor's efforts to maximize estate value for all parties in interest.

27.      I believe that the Debtor is sophisticated with a Cash Management System that relies on the Bank Accounts on a daily basis.  I believe that the Debtor Bank Accounts are held at a stable financial institution that is insured by the FDIC and, thus, the Debtor's funds are safe (up to applicable FDIC limits).  Furthermore, in light of the regular deposits to, and sweeps of, the applicable Bank Accounts and the "as needed" funding structure of the overall system, I believe it would be especially disruptive, unnecessary, and wasteful to require the posting of a bond to the extent that the balances of the Debtor Bank Accounts exceed FDIC insurance limits at a given time.

B.        **Workforce Obligations Motion**

28.       In the Workforce Obligations Motion,[5] the Debtor seeks entry of interim
and final orders authorizing it, in its discretion, to pay, continue, or otherwise honor various
prepetition workforce-related obligations (collectively, the "**Prepetition Workforce
Obligations**") to or for the benefit of its full-time, part-time, and permanent employees
(collectively, the "**Employees**," or, the "**Workforce**") for compensation and benefits under all
plans, programs, and policies covering the Workforce prior to the Petition Date (as further
described in the Workforce Obligations Motion, the "**Workforce Programs**").

29.       The Workforce Programs[6] under which the Prepetition Workforce
Obligations arise are described more fully herein and in the Workforce Obligations Motion and
include, without limitation, plans, programs, policies, and agreements providing for wages,
salaries, bonuses, holiday, vacation, and sick pay, and other accrued compensation.

30.       The Debtor also seeks authorization through the Workforce Obligations
Motion to be permitted to pay any and all local, state, and federal withholding and payroll-
related or similar taxes relating to the Prepetition Workforce Obligations including, but not
limited to, all withholding taxes, social security taxes, and Medicare taxes.  In addition, the
Debtor seeks authorization to pay to third parties any and all amounts deducted from Employee
paychecks for payments on behalf of Employees for garnishments, support payments, savings
programs, benefit plans, insurance programs, and other similar programs.

---

[5] The "Workforce Obligations Motion" refers to that certain motion filed concurrently herewith seeking relief related to the Debtor's Prepetition Workforce Obligations and Workforce Programs and items related thereto.

[6] I am informed and believe that the Debtor anticipates instituting new benefits programs commencing on or after the Petition Date to provide benefits to its Employees that were previously provided by plans that terminated prior to the Petition Date, such as insurance programs, expense reimbursement programs, and other additional benefits.

31.     The Debtor also requests that, with respect to any Workforce Programs that were administered, insured, or paid through a third-party administrator or provider, the Debtor be expressly authorized, in its discretion, to pay any prepetition claims of such administrator and provider.

32.     Further, through the Workforce Obligations Motion, the Debtor requests that the Court authorize and direct all banks to receive, process, honor, and pay any and all checks drawn on the payroll and other bank accounts used by the Debtor to satisfy its Prepetition Workforce Obligations upon receipt by each bank or financial institution of notice of such authorization, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

33.     I believe that the Debtor's ability to preserve its business and successfully reorganize is dependent on the expertise and continued enthusiasm and service of its Workforce. Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, I believe that the morale and, thus, the performance of its Workforce may be adversely affected.

34.     It is my belief that if the Debtor fails to pay the Prepetition Workforce Obligations in the ordinary course, its Workforce will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  Such a result would have a highly negative impact on Workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtor and its estate.  I believe that payment of such obligations is vital to preserving and rebuilding Workforce morale during the pendency of this Chapter 11 Case and to reducing the level of attrition that might otherwise occur.

35.     I believe that without payment of the Prepetition Workforce Obligations, the Debtor's business and operations will be detrimentally impacted through the reduction in Workforce morale and the potential loss of key personnel during a critical time for the Debtor and its business.

          i.     <u>Prepetition Workforce Compensation</u>

36.     It is my understanding that the Debtor employs approximately 54 Employees on a full- or part-time basis and does not employ any temporary employees or independent contractors.  I have been informed and believe that the payroll period for Employees is bi-weekly and paid three days in arrears.  For example, the current Employee pay period runs December 5, 2016 through December 18, 2016, and the Employees would receive their wages on December 21, 2016.  I am informed and believe that the Debtor also employs two Employees in California (the "**California Employees**") and that the California Employees will be paid for the period December 5, 2016 through December 15, 2016 on December 16, 2016, and then will be paid one additional day's wages for December 16, 2016 on December 21, 2016.

37.     It is my understanding that the Debtor utilizes Paycor to process its payroll and the Employees' wages are paid through Paycor and that Paycor withdraws the amount necessary to fund the Employees' payroll from the Debtor's operating bank accounts each pay period.

38.     I am further informed and believe that as part of their overall compensation, Employees are entitled to receive a certain number of vacation days, paid sick leave days, and holidays each year.

39.     With two limited exceptions, the Debtor is not seeking to pay any amounts over the $12,850 cap of Bankruptcy Code Sections 507(a)(4) and 507(a)(5), to the extent such cap is applicable.  As to wages and salaries only, as of the Petition Date, I am informed and

believe that no Employee is owed more than $12,850 other than these two exceptions.  The two exceptions are that the Debtor seeks authority to pay prepetition wages to the Debtor's CEO which exceed the $12,850 cap by $226.92 and the Debtor seeks authority to pay the Debtor's controller wages and PTO that exceed the statutory cap by $419.23.

ii.    <u>Employee Benefits</u>

40.    It is my understanding that prior to the Petition Date, the Debtor's predecessor in interest was obligated to pay certain contributions to or provide benefits under plans, programs, and policies including a 401(k) program.  Such obligations of the Debtor's predecessor in interest were assumed by the Debtor prepetition and constitute part of the Prepetition Workforce Obligations.

iii.    <u>Payment to Administrators</u>

41.    With respect to the Prepetition Workforce Obligations, it is my understanding that several vendors provided services to administer and deliver payments or other benefits to its Employees (the "**Administrators**").

42.    In conjunction with the Debtor's payment of Prepetition Workforce Obligations, I believe that it is necessary to obtain specific authorization to pay any claims of the Administrators with respect to such obligations.  I believe that the Administrators may fail to adequately and timely perform or may terminate their services to the Debtor unless the Debtor pays the Administrators' prepetition claims for administrative services rendered and expenses incurred.  Accordingly, I believe that the payment of claims owed to the Administrators with respect to the Prepetition Workforce Obligations is in the best interest of the Debtor's estate.

### C.    Utilities Motion

43.    In the Utilities Motion,[7] the Debtor requests entry of interim and final orders approving procedures that would provide adequate assurance of payment to its utility service providers (the "**Utility Companies**") under Bankruptcy Code Section 366, while allowing the Debtor to avoid the threat of imminent termination of electricity, water, natural gas, waste removal, telephone, internet, alarm, telecommunication and similar utility products and services (collectively, the "**Utility Services**") from those Utility Companies.  Specifically, the Debtor requests entry of interim and final orders (a) approving the Debtor's deposit of $3,250 (which is approximately 50% of the estimated monthly cost of the Utility Services based on historical averages over the preceding 12 months) into a newly created, segregated, interest-bearing account, as adequate assurance of postpetition payment to the Utility Companies pursuant to Bankruptcy Code Section 366(b), (b) approving the additional adequate assurance procedures described below as the method for resolving disputes regarding adequate assurance of payment to Utility Companies, and (c) prohibiting the Utility Companies from altering, refusing, or discontinuing services to or discriminating against the Debtor except as may be permitted by the proposed procedures.

44.    I am informed and believe that, as of the Petition Date, approximately six (6) Utility Companies provide Utility Services to the Debtor at its headquarters in Orlando, Florida.  On average, during the twelve month period preceding the Petition Date, the Debtor spent approximately $6,500 each month on utility costs and generally made timely payments of utility costs.  The Debtor is not currently aware of any past due amounts owed to any of the Utility Companies.  Based on the timing of the filings in relation to the Utility Companies'

---

[7] The "Utilities Motion" refers to that certain motion filed concurrently herewith seeking relief related to the Debtor's Utility Services and items related thereto.

billing cycles, however, there may be prepetition utility costs that have been invoiced to the

Debtor for which payment is not yet due and prepetition utility costs for services provided since

the end of the last billing cycle that have not yet been invoiced to the Debtor.

45.     I believe that the Utility Services are crucial to the continued operations of

the Debtor's business.  I believe that the Debtor cannot operate its business without the Utility

Services.  I believe that if the Utility Companies refuse or discontinue service, even for a brief

period, the Debtor's business operations would be severely disrupted, and the Debtor could be

forced to cease operations.

46.     The Debtor intends to pay all postpetition obligations owed to the Utility

Companies in a timely manner.  Nevertheless, to provide additional assurance of payment for

future services to the Utility Companies, the Debtor has proposed certain protections and

procedures in the Utilities' Motion.

**D.     Equity Securities Trading Motion**

47.     In the Equity Securities Trading Motion,[8] the Debtor requests

authorization to protect and preserve its Tax Attributes (as defined below) by establishing certain

notice and hearing procedures that must be satisfied before shareholders may make transfers of,

or claims of worthlessness with respect to, equity interests in the Debtor.  It is my understanding

that these procedures will generally apply to any person or shareholder who owns, directly or

indirectly, any of the Debtor's stock.  I believe that the relief sought in the Equity Securities

Trading Motion will allow the Debtor to monitor certain transfers of, and any worthlessness

deductions with respect to the Debtor's equity securities so that the Debtor can act expeditiously

to prevent such transfers or deductions, if necessary, and preserve the value of its net operating

---

[8] The "Equity Securities Trading Motion" refers to that certain motion filed concurrently herewith seeking relief related to the Debtor's NOLs and items related thereto.

losses (the "**NOLs**"), tax credits, and certain other tax attributes (collectively, the "**Tax Attributes**").  I believe that the relief sought will allow the Debtor the time necessary to obtain the requisite approval of a plan of reorganization, and for the plan to be effective, which maximizes the use and value of its NOLs.  I believe that immediate entry of the Interim Order is necessary to preserve the status quo in this regard.

48.     I believe that the Debtor's Tax Attributes are valuable assets of the Debtor's estate because it is my understanding that the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), generally permits corporations to carry forward their NOLs and tax credits to offset future taxable income, thereby reducing their federal tax liability in future periods.   I believe that the Debtor's Tax Attributes could allow the Debtor to significantly reduce future U.S. federal income tax liability, depending upon future operating results of the Debtor, and absent any intervening limitations prior to the effective date of a chapter 11 plan of reorganization.  I further believe that these savings could substantially enhance the Debtor's value and contribute to the Debtor's efforts toward a successful reorganization.

49.     I have been advised that the ability of a corporation to use its Tax Attributes to reduce future tax liability is subject to certain limitations under section 382 of the Tax Code ("**Section 382**").  It is my understanding that, in general, if a corporation undergoes an "ownership change," Section 382 limits the corporation's ability to use its net operating losses and certain other tax attributes to offset future income.  Under Section 382, an ownership change occurs when the percentage (by value) of a corporation's equity held by one or more "5-percent shareholders" (as such term is defined in Section 382) increases by more than 50 percentage points over the lowest percentage of stock owned by such shareholders at any time during a three-year rolling testing period.

50.     I have been informed that when an ownership change occurs, Section 382 limits the amount of taxable income that can be offset by a pre-change-of-ownership loss to the long-term tax exempt bond rate (as published by the United States Treasury), as of the ownership change date, multiplied by the value of the stock of the corporation immediately before the ownership change (a "**Section 382 Limitation**").  It is my understanding that, under certain circumstances, built-in losses recognized during the five-year period after the change date are subject to similar annual limitations.  Accordingly, an ownership change under Section 382 prior to the effective date of a chapter 11 plan may hinder or significantly reduce the ability of the Debtor to use its Tax Attributes on a reorganized basis, thereby resulting in a loss of potential value to the Debtor's estate.

51.     Similarly, I understand that if a 50-percent or greater shareholder were, for federal or state tax purposes, to treat its equity interests in the Debtor as becoming worthless prior to the Debtor emerging from chapter 11 protection, Section 382(g)(4)(D) of the Tax Code would deem such treatment as a transfer, which could trigger an ownership change, and thus adversely affect the Debtor's Tax Attributes.

52.     I believe that by establishing procedures for continuously monitoring the trading of the Debtor's equity securities, the Debtor can preserve its ability to seek substantive relief at the appropriate time, particularly if it appears that additional trading may jeopardize the use of the Debtor's Tax Attributes.

53.     The Debtor also requests through the Equity Securities Trading Motion that the Court enter an order restricting the ability of shareholders that own or have owned 50-percent or more, by value, of the Debtor's equity securities to claim a deduction for the worthlessness of those securities on their federal or state tax returns for a tax year ending before

the Debtor emerges from chapter 11 protection.  I understand that under Section 382(g)(4)(D) of the Tax Code, any securities held by such a shareholder are treated as though they were transferred if such shareholder claims a worthlessness deduction with respect to such securities. I believe it is therefore essential that the shareholders that own or have owned 50-percent or more of the Debtor's equity securities defer claiming such deduction until after the Debtor has emergency bankruptcy.

54.     The Debtor also requests that the Court permit the Debtor to waive, in writing and in its sole and absolute discretion, any and all restrictions, stays, and notification procedures contained in this Motion or in any order entered with respect hereto.  I am informed and believe that the Debtor will be able to grant such waivers for small holders based on an analysis of the specific facts at the time of the proposed transfer, while still protecting the Debtor's tax attributes.

55.     I am informed and believe that the Debtor has incurred approximately $100 million in NOLs for U.S. federal income tax purposes.  I believe that the Debtor's NOLs are a valuable asset of its estate that, if available, could help facilitate the Debtor's successful reorganization and serve to improve creditor recoveries.  I further believe that the Debtor's ability to use its Tax Attributes, however, could be severely limited under Section 382 as a result of the trading and accumulation of Debtor's equity securities, or claims of worthlessness with respect thereto, prior to the consummation of a chapter 11 plan.

56.     I believe that the relief sought in the Equity Securities Trading Motion is necessary to avoid the irreparable harm that would be caused by unrestricted trading of, and claims of worthlessness with respect to, equity securities in the Debtor and the Debtor's resulting inability to offset taxable income with its NOLs.

57.     I believe that the Debtor's Tax Attributes are valuable assets that will inure to the benefit of its stakeholders and facilitate the Debtor's reorganization.  I believe that unrestricted trading in equity securities of the Debtor with no advance warning of such trades or unrestricted deductions for worthless stock would jeopardize and impair the value of these assets. I believe that the requested relief imposes a minimal burden to achieve a substantial benefit for the Debtor, its creditors, and other interested parties.

## II.     CONCLUSION

58.     The Debtor's ultimate goal in this Chapter 11 Case is the reorganization of the Debtor.  In the near term, however, to minimize any loss of value of its business during this Chapter 11 Case, the Debtor's immediate objective is to maintain a business-as-usual atmosphere during the early stages of this Chapter 11 Case, with as little interruption or disruption to the Debtor's operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and completing a successful reorganization or sale of the Debtor's business will be substantially enhanced.

59.     I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 16th day of December, 2016.

Lensar, Inc.
Debtor and Debtor in Possession

Nicholas T. Curtis
Chief Executive Officer of Lensar, Inc.